UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No. CR 19-0784 FMO |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **ORDER RE: MOTION TO SUPPRESS** |
| ESMERELDA DIAZ, | ) | |
| Defendant. | ) | |

Esmerelda Diaz ("Diaz" or "defendant") has been charged with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii). (See Dkt. 1, Indictment). The charge stems from Diaz's September 9, 2019, arrest and the subsequent search of a 2009 Ford Fusion that Diaz was driving at the time. (See Dkt. 54-1, Exh. A, Arrest Report).

Having reviewed and considered all the briefing filed with respect to Diaz's Motion to Suppress Evidence Derived From Unlawful Search, (Dkt. 54, "Motion"), the court finds that oral argument is unnecessary,[1] see Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

---

[1] The court also finds that an evidentiary hearing is unnecessary. "An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." United States v. Howell, 231 F.3d 615, 620 (9th Cir. 2000). Here, neither party has identified a significant disputed factual issue necessitating an evidentiary hearing. (See, generally, Dkt. 54, Motion); (Dkt. 68, Government's Opposition to Defendant's Motion to Suppress); (Dkt. 71, Reply in Support of Motion to Suppress Evidence).

**BACKGROUND**

On September 9, 2019, Los Angeles Police Department ("LAPD") Detective Supervisor Guillermo Avila ("Avila") spoke with a confidential informant ("CI"), who stated that she[2] had negotiated with an unnamed female, later identified as defendant, to purchase 30 pounds of methamphetamine. (See Dkt. 68, Exh. 1, Declaration of Guillermo Avila ("Avila Decl.") at ¶ 4); (Dkt. 54-1, Exh. A, Arrest Report at 2). The CI informed Avila that the transaction was scheduled to take place at 12:00 p.m. in a parking lot located at 9900 Sepulveda Boulevard in Los Angeles ("the parking lot"). (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 6); (Dkt. 54-1, Exh. A, Arrest Report at 2).

Shortly before noon, the CI met Detective Prodigalidad ("Prodigalidad"), Detective Chapman ("Chapman"), Officer Olsen ("Olsen"), Officer Reilley ("Reilley"), Officer Gutierrez ("Gutierrez"), and Avila (collectively, "the officers"), at Mission Station located on Sepulveda Blvd in Mission Hills. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 6); (Dkt. 54-1, Exh. A, Arrest Report at 1-2). Reilley and Gutierrez were wearing police uniforms and driving a marked police vehicle. (See Dkt. 54-1, Exh. A, Arrest Report at 2-3). The remaining officers were dressed in plain-clothes and driving unmarked vehicles. (See id.). The officers searched the CI and her vehicle to confirm that she did not have any contraband. (See id. at 3). The officers then followed her in their vehicles to the parking lot, and set up observation posts. (See id.).

At 12:25 p.m., defendant drove into the parking lot in a black Ford Fusion and parked in front of the CI's vehicle. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 7); (Dkt. 54-1, Exh. A, Arrest Report at 3). The CI exited her vehicle and approached and opened the front door of defendant's Ford Fusion. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 7); (Dkt. 54-1, Exh. A, Arrest Report at 3). The CI then spoke with defendant for several minutes while standing outside of defendant's vehicle. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 7); (Dkt. 54-1, Exh. A, Arrest Report at 3). Prior to approaching defendant's vehicle, the CI had called Avila on his cell phone, and concealed her cell phone in her

---

[2] The gender of the CI is unknown, but the court will use female pronouns in connection with the CI for ease of reference.

clothing so that Avila could hear the CI's conversation with defendant. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 7). However, Avila could not hear the entire conversation with clarity, because of where the CI had placed her cell phone. (See id.).

After the CI's conversation with defendant, the CI closed the passenger door and defendant pulled out of the parking lot. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 8); (Dkt. 54-1, Exh. A, Arrest Report at 3). The CI then informed Avila that defendant stated that she wanted to meet the CI before completing the transaction, (see Dkt. 68, Exh. 1, Avila Decl. at ¶ 8); (Dkt. 54-1, Exh. A, Arrest Report at 3), and that Diaz intended to drive to her motel, located on Sepulveda Boulevard and Plummer Street, retrieve the methamphetamine, and then drive back to the parking lot. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 8); (Dkt. 54-1, Exh. A, Arrest Report at 3).

While the CI remained in the parking lot, and Prodigalidad remained at his observation post to monitor the CI, Avila, Chapman, Olsen, Reilley, and Gutierrez followed defendant south on Sepulveda Boulevard. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 9); (Dkt. 54-1, Exh. A, Arrest Report at 3). Defendant pulled into the Hillcrest Inn parking lot on Sepulveda Boulevard between Plummer Street and Nordoff Street. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 9); (Dkt. 54-1, Exh. A, Arrest Report at 3). The officers observed defendant park her vehicle, enter room 117, and exit the room several minutes later with three grocery bags, which appeared to be filled with heavy items. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 9); ((Dkt. 54-1, Exh. A, Arrest Report at 3). She placed the bags in the trunk of her vehicle, drove out of the Hillcrest Inn parking lot, and then began driving north on Sepulveda Boulevard. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 9); (Dkt. 54-1, Exh. A, Arrest Report at 3). Around this time, Avila instructed Reilley and Gutierrez, who were driving in a marked police car, to conduct a traffic stop of defendant's vehicle before she reached the parking lot where the CI was located. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 9); (Dkt. 54-1, Exh. A, Arrest Report at 3).

Reilley and Gutierrez stopped defendant's vehicle on Sepulveda Boulevard, north of Plummer Street. (See Dkt. 54-1, Exh. A, Arrest Report at 3). They approached the vehicle and began to speak to defendant. (See id.). Gutierrez stated, "the reason I'm stopping you is the tinted windows in the back . . . can't see in the back side." (Video Footage from Gutierrez Body

Camera).³ Shortly thereafter, Avila, Chapman, Prodigalidad and Olsen arrived at the traffic stop. (Dkt. 54-1, Exh. A, Arrest Report at 3).

Officer Lopez ("Lopez") also responded to the scene in response to a request for a dog sniff at a traffic stop. (See Dkt. 54-1, Exh. A, Arrest Report at 3); (Dkt. 68, Exh. 2, Declaration of Anthony Lopez ("Lopez Decl.") at ¶ 4). After Lopez's arrival, Gutierrez asked defendant to step out of her vehicle, (see Video Footage from Gutierrez Body Camera), and Reilley placed her in handcuffs. (See id. at 3). Lopez then walked a narcotic detection canine around defendant's vehicle. (See Dkt. 68, Exh. 2, Lopez Decl. at ¶ 4). The canine alerted to the presence of a narcotic odor near the trunk area. (See id.). Chapman opened the trunk door, and Lopez directed the canine to conduct a second sniff of the contents of the trunk. (See Dkt. 68, Lopez Decl. at ¶ 4); (Video Footage from Gutierrez Body Camera). According to the government, the canine alerted to the presence of a narcotic odor in the three shopping bags located in the trunk. (See id.). Officer Olsen searched the three grocery bags located in defendant's trunk, and discovered 27 vacuum-sealed bags containing methamphetamine. (See Dkt. 54-1, Exh. A, Arrest Report at 3-4).

## DISCUSSION

Defendant seeks an order suppressing all evidence seized from her vehicle, and any alleged statements she made following her arrest on September 9, 2019. (See Dkt. 54, Motion at 1). First, defendant argues that the government failed to establish that probable cause existed to arrest her because: (1) the officers "conducted a pre-textual traffic stop for a minor traffic violation" and "did not find any new grounds for suspicion" prior to arresting her; (2) "[t]he confidential informant provided false information[;]" and (3) "the service dog did not provide any 'alert[.]'" (Id. at 4-5). Second, defendant asserts that, even if the service dog alerted to the presence of narcotics, the alert cannot serve as a basis for probable cause because, "[t]o date,

---

³ Defendant cites to video footage from Gutierrez's body camera, but she did not attach a copy of this footage as an exhibit to her Motion. (See Dkt. 54, Motion at 2-4). For purposes of this Order, the court will assume the veracity of defendant's representations regarding the video footage from Gutierrez's body camera.

the government's disclosed canine discovery is insufficient to support reliability." (Id. at 6). Finally, defendant argues that to the extent the government relies on defendant's statements to establish probable cause, such statements must be suppressed as "fruit of the poisonous tree" because the statements were obtained "as a result of either the pre-textual traffic stop or the unjustified arrest of" defendant. (Id. at 7).

### A. Defendant's Arrest.

Where, as here, a defendant is arrested without a warrant, "[t]here is probable cause . . . if, under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime. Probable cause demands factual specificity and must be judged according to an objective standard, taking into account the nature and trustworthiness of the evidence of criminal conduct available to the police[.]" United States v. Struckman, 603 F.3d 731, 739-740 (9th Cir. 2010) (internal citations, brackets, and quotation marks omitted). "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, mere suspicion, common rumor, or even strong reason to suspect are not enough." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (quotation marks and alteration marks omitted). "The Government bears the burden of showing that a warrantless arrest did not violate the Fourth Amendment." United States v. Valencia, 24 F.3d 1106, 1108 (9th Cir. 1994).

Defendant argues that, under the totality of circumstances here, the officers did not have probable cause arrest defendant. (Dkt. 54, Motion at 4-5). According to defendant, the information provided by the CI was uncorroborated, (see id. at 5), and "[t]he confidential informant provided false information in that the earlier interaction with Ms. Diaz did not lead to an observed drug exchange but rather Ms. Diaz leaving." (Id.).

In Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317 (1983), an Illinois police department received an anonymous letter reporting that the defendants, who were married, were involved in a drug trafficking operation. See id. at 225, 103 S.Ct. at 2325. Among other details, the letter stated that on a certain date, the defendant wife would drive to Florida, leave her vehicle, and then the defendant husband would fly to Florida a few days later, and drive the vehicle back to Illinois

1  with drugs located in the trunk of the vehicle. See id. Law enforcement officers conducted
2  surveillance of the defendants, and observed them act consistent with the letter's predictions. See
3  id. at 226, 103 S.Ct. at 2326. A detective on the case set forth these observations in an affidavit,
4  submitted it to a judge with a copy of the anonymous letter, and the judge thereafter issued a
5  search warrant for the defendants' vehicle and home. See id. The trial court, Illinois Circuit Court,
6  and the Supreme Court of Illinois all concluded that "standing alone, the anonymous letter . . .
7  would not provide the basis for a magistrate's determination that there was probable cause to
8  believe contraband would be found in the [defendants'] car and home. See id. at 227, 103 S.Ct.
9  at 2326.

10        The Supreme Court reversed, concluding that "the judge issuing the warrant had a
11  'substantial basis for . . . conclud[ing]' that probable cause to search the [defendants'] home and
12  car existed." Gates, 462 U.S. at 246, 103 S.Ct. at 2336. In reaching its decision, the Gates court
13  reasoned that the Supreme Court of Illinois improperly applied a two-prong test for probable cause
14  that "direct[ed] analysis into two largely independent channels - the informant's 'veracity' or
15  'reliability' and his 'basis of knowledge.'" Id., at 233, 103 S.Ct. at 2329. The court held that a fluid
16  totality-of-the-circumstances test that "recognized the value of corroboration of details of an
17  informant's tip by independent police work" was more appropriate. See id. at 241, 103 S.Ct. at
18  2334. In applying this test, the court reasoned that "while the honesty and reliability of the
19  anonymous informant . . . were unknown to the [ ] police[,] . . . this distinction . . . became far less
20  significant after [the detective's] independent investigative work occurred." Id. at 244, 103 S.Ct.
21  at 2335. Indeed, "[t]he corroboration of the letter's predictions . . . all indicated, albeit not with
22  certainty, that the informant's other assertions [regarding the defendants' drug trafficking activities]
23  also were true." Id. The court thus concluded that the search warrant at issue was supported by
24  probable cause. See id. at 246, 103 S.Ct. at 2336.

25        Here, contrary to defendant's assertions, the officers' corroboration of the information
26  provided by the CI supports a finding of probable cause. Like the Gates informant, the CI provided
27  information to Avila regarding defendant's future plans when the CI informed Avila: (1) that she
28  had negotiated to purchase several pounds of methamphetamine from defendant at 12:00 p.m.

6

in a specific parking lot, (see Dkt. 68, Exh. 1, Avila Decl. at ¶¶ 4, 6); and (2) after speaking with defendant in the parking lot, that Diaz planned to drive to a motel to retrieve the methamphetamine and then return to the parking lot to complete the transaction. (See id. at ¶ 8). Just as the Gates detective's investigation corroborated the details provided in the anonymous letter, the officers' investigation in this case corroborated the information provided by the CI. The officers saw Diaz meet the CI at the parking lot at approximately 12:25 p.m., and they also observed defendant drive to a motel, retrieve three heavy bags from a motel room, place the bags in her trunk, and then begin driving in the direction of the parking lot where she had earlier met the CI. (See Dkt. 68, Exh. 1, Avila Decl. at ¶¶ 7 & 9); (Dkt. 54-1, Exh. A, Arrest Report at 3). This "corroboration . . . indicate[s], albeit not with certainty, that the [CI's] other assertions [regarding defendant's intent to transport methamphetamine from the motel to the parking lot to sell to the CI] also were true." Gates, 462 U.S. at 244, 103 S.Ct. 2335. Finally, while the Gates informant's reliability was unknown, the CI in this case had previously provided reliable information to Avila and his partners which led to the seizure of drugs and firearms. Indeed, Avila described the CI as "one of [his] most trusted informants." (Dkt. 68, Exh. 1, Avila Decl. at ¶ 5).

Defendant also contends that the officers "conducted a pre-textual traffic stop for a minor traffic violation[,]" and "the fact that the police felt they needed to do a pre-textual stop undermines any credibility in the informant[.]" (Dkt. 54, Motion at 4-5). Defendant's contentions are unpersuasive.

United States v. Magallon-Lopez, 817 F.3d 671 (9th Cir. 2016) is instructive on this issue. In Magallon-Lopez, officers investigating an interstate drug-trafficking ring learned through wiretap intercepts that a shipment of methamphetamine would be traveling by car through Bozeman, Montana. See id. at 673. The officers set up surveillance on a highway near Bozeman, and when they saw a vehicle matching the description they obtained from the wiretap intercepts, they decided to conduct an investigatory stop. See id. One of the officers told the defendant, who was the driver of the vehicle, that "the reason for the stop was [his] failure to signal properly before changing lanes[, but t]he officer knew this was not the real reason for the stop[.]" Id. at 673-74. The Ninth Circuit found that "[t]he officers [ ] had probable cause to believe that methamphetamine

would be found in the car" based on the information they had received from the wiretap intercepts. See id. at 674. In addressing the officer's statement to the defendant that he was being stopped for a traffic violation, the court stated:

> That the officer lied about seeing [defendant] make an illegal lane change does not call into question the legality of the stop. The standard for determining whether probable cause or reasonable suspicion exists is an objective one; it does not turn either on the subjective thought processes of the officer or on whether the officer is truthful about the reason for the stop.

Id. at 675.

Here, Gutierrez, like the officer in Magallon-Lopez, knew that the real reason for the stop was to arrest defendant for transportation of a controlled substance. (See Dkt. 68, Exh. 1, Avila Decl. at ¶ 9); (Dkt. 54-1, Exh. A, Arrest Report at 3). That Gutierrez lied to defendant about the reason for the traffic stop does not, without more, undermine the credibility of the CI, i.e., whether the officer had probable cause to believe that drugs would be found in the Ford Fusion. As Magallon-Lopez makes clear, probable cause is based on an objective standard, and "does not turn . . . on whether the officer is truthful about the reason for the stop." Magallon-Lopez, 817 F.3d at 675.

Finally, defendant argues that once "at the hotel, the officers observed solely what they describe as 'grocery bags.'" (Dkt. 54, Motion at 5). However, defendant's argument appears to ignore the information the CI provided to the officers about defendant's intentions to complete a drug transaction, and that much of the information provided by the CI was by then corroborated by defendant's actions. In determining whether there was probable cause to arrest Diaz for transportation of a controlled substance, the officers considered the following: (1) the CI had previously provided Avila and his partners with reliable information that led to seizures of drugs and firearms, and was "one of [Avila's] most trusted informants[,]" (Dkt. 68, Exh. 1, Avila Decl. at ¶ 5); (see Dkt. 54-1, Exh. A, Arrest Report at 2); (2) the CI informed Avila on September 9, 2019, that defendant planned to meet her at 12:00 p.m. in a specific parking lot the same day, and defendant arrived at the parking lot at 12:25 p.m. and met with the CI, (see Dkt. 68, Exh. 1, Avila

Decl. at ¶¶ 4 & 7); (Dkt. 54-1, Exh. A, Arrest Report at 3); and (3) the CI informed Avila, after she spoke with Diaz in the parking lot, that defendant planned to drive to a motel, retrieve the methamphetamine, and return to the parking lot, and defendant's conduct was consistent with the CI's information. (See Dkt. 68, Exh. 1, Avila Decl. at ¶¶ 8-9); (see Dkt. 54-1, Exh. A, Arrest Report at 3). In short, under the totality of the circumstances known to the officers at the time, a prudent person would have concluded that there was a fair probability that defendant had been transporting a controlled substance.

      B.    Search of the Vehicle.

Having determined that defendant's arrest was supported by probable cause, the court next considers the search of the Ford Fusion. Defendant argues that the government has not shown Lopez's canine to be reliable. (See Dkt. 54, Motion at 5-6). However, the court need not address the reliability of the canine because the officers had probable cause to search the Ford Fusion.

"Officers may search an automobile so long as they have probable cause." United States v. Ibarra, 345 F.3d 711, 715 (9th Cir. 2003). "No warrant is necessary because of the [ ] 'automobile exception' to the Fourth Amendment's warrant requirement." Id. (citing California v. Acevedo, 500 U.S. 565, 569, 111 S.Ct. 1982, 1986 (1991). "Probable cause to search exists when the known facts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found." Id.

Here, the officers had probable cause to search the Ford Fusion for the same reasons that they had probable cause to arrest defendant for transportation of a controlled substance. See supra at § I.A.; (Dkt. 54-1, Arrest Report at 4). At the time of the search, the officers knew that: (1) the CI had previously provided Avila and his partners with reliable information, (see Dkt. 68, Exh. 1, Avila Decl. at ¶ 5); (see Dkt. 54-1, Exh. A, Arrest Report at 2); (2) the CI had informed Avila that Diaz planned to meet her at a specific parking lot around noon, which defendant did, (see Dkt. 68, Exh. 1, Avila Decl. at ¶¶ 4 & 7); (Dkt. 54-1, Exh. A, Arrest Report at 3); and (3) after meeting with Diaz in the parking lot, the CI informed Avila that defendant was going to – and actually did – drive to a motel, retrieve the drugs, and return to the parking lot to complete the drug transaction. (See Dkt. 68, Exh. 1, Avila Decl. at ¶¶ 8-9); (see Dkt. 54-1, Exh. A, Arrest Report at

3). Under the circumstances, it was reasonable for the officers to believe that the vehicle defendant had just been driving, and specifically, the bags in the trunk of the vehicle, "contain[ed] evidence of the offense of arrest." See Gant, 556 U.S. at 351, 129 S.Ct. at 1723. Thus, the court is persuaded that the officers had probable cause to search the Ford Fusion.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT defendant's Motion to Suppress Evidence Seized From Unlawful Search **(Document No. 54)** is **denied**.

Dated this 13th day of April, 2021.

/s/
Fernando M. Olguin
United States District Judge